RECEIVED
IN MONROE, LA
JUN 1 0 2008
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| CNH CAPITAL AMERICA, LLC, ET AL. | CIVIL ACTION NO. 07-0611 |
| VERSUS | JUDGE ROBERT G. JAMES |
| WILMOT FARMING VENTURES, LLC, ET AL. | MAG. JUDGE KAREN L. HAYES |

## RULING

Before the Court is a Motion for Summary Judgment [Doc. No. 13] filed by Plaintiff CNH Capital America, LLC ("CNH Capital") against Defendants Wilmot Farming Ventures, LLC ("Wilmot"); Arkla Farming Ventures, LLC ("Arkla"); Wilmot Flying Service, LLC ("Wilmot Flying"); and Jeffrey H. Morris ("Morris") (collectively "Defendants"). For the following reasons, CNH Capital's Motion for Summary Judgment is GRANTED.

### I. Facts and Procedural History

Wilmot and Arkla bought agricultural equipment from Scott Tractor Co., L.L.C. ("Scott Tractor") under three different contracts on two different days (collectively "the Contracts").

The first of the Contracts was formed on October 11, 2004, when Wilmot executed an agreement with Scott Tractor to purchase farm equipment ("Wilmot Contract"). The second and third contracts were formed on November 22, 2004, when Wilmot executed a second agreement to purchase more farm equipment from Scott Tractor ("Wilmot Contract II"), and Arkla executed an agreement to purchase a tractor from Scott Tractor ("Arkla Contract"). Morris and Wilmot

1

Flying are listed as guarantors of the Contracts.

Around the time each of the Contracts were signed, the Store Manager of Scott Tractor, Larry D. Williams, Sr. ("Williams"), gave Arkla and Wilmot a signed letter (collectively the "Scott Tractor Letters"), printed on Scott Tractor letterhead and stating, in capital letters, that the equipment could be returned after twelve months. For example, around the time the Arkla Contract was formed, Williams gave Arkla a letter stating, "THE TERMS OF OUR AGREEMENT ARE FOR 12 MONTHS. AFTER WHICH TIME, YOU HAVE THE OPTION OF RETURNING THIS EQUIPMENT TO US OR YOU MAY CONTINUE WITH THE TERMS OF THE LEASE/CONTRACT."[1]

A provision in the Contracts notified the buyer that the "Seller [would] assign this Contract to Case Credit Corporation,"[2] and, consistent with this provision, Scott Tractor assigned the Contracts to CNH Capital after the Contracts were signed.

After twelve months, Defendants returned the equipment to Scott Tractor and stopped paying. CNH Capital then notified the appropriate Defendants that they were in default.

After providing notice to the Defendants, CNH Capital sold the equipment and applied the sales proceeds to the balance on the corresponding contract. However, the proceeds were insufficient to cover the corresponding debts: the Wilmot Contract has a remaining balance of $134,295.62; the Wilmot II Contract has a remaining balance of $129,002.63; and the Arkla Contract has a remaining balance of $38,134.20.

---

[1] There are only minor differences between the text of the letters that Williams gave to the Defendants.

[2] Case Credit Corporation was the predecessor of CNH Capital.

2

CNH Capital has filed a motion for summary judgment seeking to recover the principal, interest, and attorneys' fees related to the Contracts, and Defendants have filed a joint opposition memorandum, arguing that the Scott Tractor Letters modified the Contracts and CNH Capital knew about the modifications. Defendants also argue that, even if they are liable under the Contracts, they are not responsible for the entire balance on each contract because CNH Capital failed to sell the equipment in a commercially reasonable manner.

## II. Law and Analysis

### A. Summary Judgment

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of informing the Court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. Topalian v. Ehrmann, 954 F.2d 1125, 1132 (5th Cir. 1992). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. Id. The moving party cannot satisfy its initial burden simply by setting forth conclusory statements that the nonmoving party has no evidence to prove its case. Ashe v. Corley, 992 F.2d 540, 543 (5th Cir. 1993).

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. Norman v. Apache

Corp., 19 F.3d 1017, 1023 (5th Cir. 1994). The nonmoving party must show more than "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In evaluating the evidence tendered by the parties, the court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. Anderson, 477 U.S. at 255.

### B. Contract Modification

The parties agree that Louisiana law governs the Court's analysis. Because the Contracts granted Scott Tractor a valid security interest in the purchased equipment, the Contracts in this case are governed by Chapter 9 of Title 10 of Louisiana's Revised Statutes. La. Rev. Stat. § 10:9-109 (a) ("[T]his chapter applies to . . . a transaction, regardless of its form, that creates by contract a security interest in any type of personal property . . . ."). Chapter 9's provisions prevail over conflicting provisions of Louisiana's Civil Code. See La. Rev. Stat. § 9:3192; Security Nat'l Partners, L.P. v. Baxley, 37,747, p.7 n.3 (La. App. 2 Cir. 10/29/03); 859 So.2d 890, 895 n.3.

The Contracts do not provide that Scott Tractor will pay the buyers' debt if the equipment is returned after twelve months. Defendants, however, argue that the Scott Tractor Letters and the conduct of the parties modified the terms, such that Scott Tractor agreed to pay Defendants' debt to CNH Capital if the equipment was returned. CNH Capital responds that the Contracts required that all modifications be "in writing and signed by the parties," and, therefore, the Scott Tractor Letters did not modify the Contracts because they were signed only by the store manager

4

of Scott Tractor, not by Arkla or Wilmot.[3]

The first issue, then, is whether a contract that requires modifications to be signed by the parties can nonetheless be modified by other means.

In Louisiana, the parties to a contract can modify the contract through oral agreement or by other conduct, even if the contract language precludes modification by those methods. See Taita Chemical Co., LTD v. Westlake Styrene Corp., 246 F.3d 377, 386 (5th Cir. 2001) ("It is well established that even if the written contract contains a provision requiring that all modifications be in writing . . . either oral agreement or conduct can nonetheless prove modification."). "In all instances, however, the party urging modification must establish that the parties mutually consented to the agreement as modified." Id. (citing La. Civ. Code art. 1927) (other citations omitted). This consent may be made orally, be manifested by a writing, or be manifested by "action or inaction that under the circumstances is clearly indicative of consent." Id. Thus, even if a contract requires modifications to be signed by the parties, Louisiana courts will recognize modifications by other means as long as the evidence is "clearly indicative" that the parties to the contract consented to the modification.

Here, a reasonable jury could find that the evidence is clearly indicative that Scott Tractor, Arkla, and Wilmot mutually consented to a modification that would release Defendants from the Contracts if they returned the equipment to Scott Tractor after twelve months.

Williams, the manager of the Scott Tractor store, and Arkla and Wilmot agree that they

---

[3] Although Case Credit, the predecessor of CNH Capital, is often referenced in the Contracts, it is not a party to those Contracts. The Contracts are between buyer, i.e., Arkla or Wilmot, and seller, i.e., Scott Tractor. Case Credit is only designated as an assignee under the Contracts.

5

mutually consented to modify the Contracts. Specifically, Williams testified that he "wrote and signed [the Scott Tractor Letters] on behalf of Scott Tractor," and that he intended for the letters to "[give] Wilmot and Arkla the option of returning the equipment." Williams also attests that "Scott Tractor [had] experienced a downturn in business," so it offered the equipment return policy to "certain customers" as an "effort to improve sales."

Past dealings among Arkla, Wilmot, and Scott Tractor also indicate that those parties intended the Scott Tractor Letters to modify the terms of the Contracts, so that Scott Tractor agreed to pay the buyers' debt if the equipment was returned. On two prior contracts that are not at issue in this case, Wilmot and Arkla were released from a contract after returning equipment to Scott Tractor. For example, Defendants' evidence indicates that, on August 30, 2004, Wilmot and Arkla entered into agreements to purchase tractors from Scott Tractor. When those agreements were formed, Williams, as in this case, gave Wilmot and Arkla letters related to each contract, stating that the tractors could be returned after twelve months. Wilmot and Arkla returned the tractors about a year later, and, on September 19, 2005, Scott Tractor paid CNH Capital the remaining balance on those two contracts.

Under these circumstances, a reasonable jury could conclude that the Scott Tractor Letters and the course of dealing between the parties modified the Contracts.

CNH Capital next argues that, even if the Contracts were modified, the modification cannot be asserted against CNH Capital because the Contracts included a "waiver of defenses agreement," under which Arkla and Wilmot agreed "not [to] assert against Assignee any claim or defense which [they] may have against [Scott Tractor]." Simply put, CNH Capital argues that the modification defense cannot be raised against it.

6

The "waiver of defenses agreement" is only valid against defenses unknown to CNH Capital at the time it took the assignment. La. Rev. Stat. § 10:9-403(b) (providing that an "Agreement not to assert defenses against assignee . . . [is] enforceable by an assignee that takes an assignment: . . . without notice of a defense."). Therefore, the issue is whether CNH Capital, at the time it took the assignment, knew about the modification defense.

### 1.   Can a reasonable jury conclude that CNH Capital knew the Contracts were modified?

CNH Capital claimed in its Motion for Summary Judgment that it did not know the Contracts were modified. Defendants contend that Williams's affidavit establishes a genuine issue of material fact as to whether CNH Capital knew that the Contracts were modified. In addition to the Williams affidavit, Defendants also suggest in their reply brief that CNH Capital's business records reflect that they "dealt with" modified contracts before. See [Doc. No. 20 at 3] ("Plaintiff's business records reflect that it dealt with one year returns [on] other Case equipment purchase [sic] by defendants from Scott Tractor").

#### a.   CNH Capital's business records

According to Defendants' evidence, Arkla, Wilmot, and Scott Tractor, on prior occasions not at issue in this case, modified contracts to allow Arkla and Wilmot to return the equipment after one year. On those prior occasions, Arkla and Wilmot returned the equipment about a year after purchase, and Scott Tractor, after reselling the equipment, paid CNH Capital the balance on the Contracts. Although not expressly stated, Defendants suggest that a reasonable jury could infer that CNH Capital knew that the Contracts in this case were modified because CNH Capital had "dealt with" other modified contracts between Scott Tractor and Defendants.

7

CNH Capital may have "dealt with" modified contracts in the past, but there is no evidence from which a reasonable juror could conclude that CNH Capital "knew" those old contracts were modified. CNH Capital's records merely indicate that Defendant's accounts were paid after one year; there is nothing to indicate CNH Capital knew Scott Tractor paid the debt on Arkla's or Wilmot's behalf, nor is there any other evidence suggesting that CNH Capital knew those contracts were paid early because they were modified.

### b. Williams's Affidavit

According to Defendants, Williams's affidavit establishes that "plaintiff CNH and Case New Holland were both aware" that Arkla, Wilmot, and Scott Tractor had modified the Contracts. In his affidavit Williams swears:

> I personally did not deliver any of the letters to Case Credit [CNH Capital's predecessor] and I have no knowledge as to whether or not they were ever, in fact, received by Case Credit. However, on numerous occasions I personally spoke with representatives of Case New Holland, and discussed the fact that the contracts for Arkla and Wilmot, and numerous other customers of Case and/or Scott Tractor, were for one year. In particular, Case's salesman, Mark Hitchcock, was aware that Scott Tractor was tendering the one-year out on a large number of its Case equipment sales . . . . During this time, this was customary means by which Scott moved Case New Holland equipment.

[Doc. No. 20-3 at ¶ 13].

Contrary to Defendants' arguments, Williams's affidavit does not create a genuine issue of material fact whether CNH Capital knew the Contracts were modified. Williams admits that he has no knowledge whether CNH Capital's predecessor, Case Credit, knew about the contract modifications. Although Williams's affidavit indicates that representatives of CNH Capital's parent company, Case New Holland, knew about the modification defense, it is undisputed that Case New Holland is a separate entity from CNH Capital.

8

Williams's affidavit also states that a representative of "Case," salesman Mark Hitchcock, knew the Contracts were modified, but it is unclear which company Williams means when he uses the word "Case." Based on this statement, Defendants argue that "plaintiff . . . [was] aware" the Contracts were modified. CNH Capital, in response to this argument, has presented an affidavit from Human Resources Representative Jeremy Bloom, who testifies that Hitchcock is an employee of one of CNH Capital's parent corporations, CNH America, but has not been an employee of CNH Capital or its predecessor, Case Credit, during the relevant time period.

Accordingly, the Court finds that Williams's affidavit does not create a genuine issue of material fact as to whether CNH Capital knew the Contracts were modified.

### 2. Can the Court impute Case New Holland's and CNH America's knowledge to CNH Capital?

Williams's affidavit does create a genuine issue of material fact whether CNH Capital's parent companies, CNH America and Case New Holland, knew the Contracts were modified. It is undisputed that CNH Capital is a wholly owned subsidiary of CNH America, which is a wholly owned subsidiary of Case New Holland.[4] CNH America and Case New Holland, therefore, are both parent companies for CNH Capital. Thus, the Court must consider whether the alleged knowledge of these parent companies can be imputed to CNH Capital.

A subsidiary is a legal entity distinct from its parent company. See Bujol v. Entergy Servs. Inc., 2003-0492, p.13-14 (La. 5/25/04); 922 So. 2d 1113, 1127-28. Louisiana courts have

---

[4] According to CNH Capital's corporate disclosure statement, it has several parent companies. CNH Capital is wholly owned by CNH America, which is wholly owned by Case New Holland, which is wholly owned by CNH Global N.V., which is partially owned by Fiat Netherlands Holding N.V. and partially owned by outside shareholders.

9

expressed a strong policy in favor of recognizing a parent and subsidiary as separate companies, and one will rarely be held accountable for the acts and knowledge of the other. See id. Courts will, however, disregard the legal fiction of a separate corporate existence for equitable reasons, such as "to defeat public convenience, justify wrong, protect fraud, or defend crime." See Smith v. Cotton Fleet Serv., Inc., 500 So.2d 759, 762 (La. 1987).

Courts will also disregard the separate corporate existence and impute the knowledge of a parent company to a closely affiliated subsidiary if the parent company acquired its knowledge while acting on the subsidiary's behalf. See Employers Nat. Ins. Co. v. Second Injury Bd., 96-1585 (La. App. 1 Cir. 5/09/97); 693 So.2d 1274, 1278-79 (imputing a parent company's knowledge of an employee's disability to a subsidiary when the parent company conducted the hiring process for its subsidiary and referred the disabled employee to the subsidiary); 3 William Meade Fletcher, et al., Fletcher Cyclopedia of the Law of Private Corporations § 814.10 (2007).[5] Conversely, courts are reluctant to impute a parent company's knowledge to a subsidiary if the parent did not participate in the transaction giving rise to the dispute. See, e.g., In re Mercedes-Benz, No. 99-4311, 2006 WL 2129100, * 17 (D. N.J. July 26, 2007); cf. Schewe v. USAA Cas. Ins. Co., 06-881, 2007 WL 2174588, *9 (E.D. La. July 7, 2007) (parent-subsidiary relationship was insufficient evidence for the Court "to conclude that notice to the parent company, who had

---

[5] See also Steel Coils, Inc. v. Captain Nicholas I M/V, 197 F. Supp. 2d 560, 567 (E.D. La. 2002) (in a maritime case, imputing a parent corporation's knowledge of clause in a shipping contract to the subsidiary because the parent company was the subsidiary's agent, "chartered all vessels for the carriage of [subsidiary's] cargo," and "had a long history of negotiating [subsidiary's] freight contracts." ); Holly & Smith Architects, Inc. v. St. Helena Congregate Facility, 2003-0481, p. 10 (La. App. 1 Cir. 2/23/04); 872 So.2d 1147, 1155 (holding the legal fiction of a distinct corporate entity may be disregarded when a corporation is so organized and controlled as to make it merely an instrumentality or adjunct of another corporation); Lucy Mfg. Corp. v. Oil City Iron Works, 131 So. 57, 59 (La. App. 2 Cir. 1930) (same).

not even been named in the suit at that time, imputes notice to its subsidiary company.").

CNH Capital claims that Defendants have failed to allege, much less establish with evidence, a reason for the Court to impute CNH America's or Case New Holland's knowledge to CNH Capital.

According to Jeremy Bloom, a human resources employee at CNH Capital, CNH America manufactures farm equipment, but is not involved in financing the sale of its equipment. CNH Capital often finances the sale of equipment manufactured by CNH America, but it sometimes finances equipment made by other manufacturers. Bloom testifies that CNH Capital and CNH America are separately incorporated with separate and independent boards of directors, officers, employees, and functions. CNH America has not acted as an agent for CNH Capital or its predecessor, Case Credit, in the financing of farm equipment purchases.

Although CNH Capital is owned by CNH America and Case New Holland, and, although it also finances equipment manufactured by CNH America, these facts alone are insufficient to establish that the companies are attempting to commit a fraud or some other wrongful act that would justify disregarding their separate corporate existences. Furthermore, there is no evidence that Case New Holland or CNH America was either involved with the Contracts or acting on CNH Capital's behalf when they learned the Contracts were modified.

The Court, therefore, finds that the evidence is insufficient to impute the alleged knowledge of Case New Holland and CNH America to CNH Capital.

### 3. Did Scott Tractor have actual or apparent authority to modify the contracts on behalf of CNH Capital?

In their brief, Defendants imply that Scott Tractor was an agent of CNH Capital when it

modified the Contracts. [Doc. No. 20-2 at p. 3] ("There is no dispute that all of the contracts in issue were modified, in writing, and signed, by Plaintiff's agent, Scott Tractor."). Arguably, the modifications are effective against CNH Capital if either Scott Tractor or Williams was acting as CNH Capital's agent when the Contracts were allegedly modified.

Agency cannot be presumed; it must be clearly established by the party asserting it. Fleet Finance, Inc. v. Loan Arranger, Inc., 91-0448 (La. App. 1 Cir. 6/29/92); 604 So.2d 656, 658 (citing Duplessis Cadillac, Inc. v. Creative Credit Services, Inc., 564 So.2d 336, 338 (La. App. 1 Cir. 1990)). An agency relationship is created by express appointment of a mandatary, La. Civ. Code Ann. § art. 2985, or by implied appointment arising from apparent authority. Bamburg Steel Buildings, Inc. v. Lawrence Gen. Corp., 36,000, p. 6 (La. App. 2 Cir. 5/8/02); 817 So.2d 427, 432. "To trigger the concept of apparent authority, the third party must prove that the principal gave the third party reason to believe that the agent had authority to act on the principal's behalf with respect to the particular action taken and that the third party reasonably relied upon the manifested authority of the agent." Id. at p. 6-7 (emphasis added) (citing Casten v. Cordell, 26,487 (La. App. 2d Cir. 01/25/95); 649 So.2d 123). "Apparent authority operates only when it is reasonable for the third person to believe the agent is authorized and the third person actually believes this." Id. (citing McManus v. Southern United Fire Ins., 00-1456 (La.App. 3d Cir.3/21/01); 801 So.2d 392). A third party may not blindly rely on the assertions of an agent, but has a duty to determine whether the agency purportedly granted by the principal permits the proposed act by the agent. Id.

Defendants note that CNH Capital has made claims in its Complaint indicating Scott Tractor was expressly authorized to act as CNH Capital's agent. In its Complaint, CNH Capital

12

states that "[Arkla and Wilmot] voluntary surrendered possession of the . . . [e]quipment to CNH Capital or its agent." [Doc. No. 1 at ¶ 22 & 31] (emphasis added); see also [Doc. No. 1 at ¶ 23] ("CNH Capital notified Defendant Wilmot that CNH Capital or its agent had secured possession of the Wilmot Equipment."). Although not clear, CNH Capital probably refers to Scott Tractor when it uses the word "agent" because the equipment was first returned to Scott Tractor.

Scott Tractor may have been an agent for CNH Capital for the surrender of the equipment, but there is no evidence establishing that Scott Tractor or Williams were express agents for CNH Capital for the modification of the Contracts. Indeed, CNH Capital has presented an uncontroverted affidavit from Jennifer Jarrett ("Jarrett"), a High Risk/Bankruptcy Analyst with CNH Capital, who testifies that "[n]either Scott Tractor, Larry Williams, nor anyone else" was authorized by CNH Capital or its predecessor Case Credit to modify the Contracts. According to Jarrett, CNH Capital did not even know about the Scott Tractor Letters until after Defendants defaulted on the Contracts.

Williams's affidavit also confirms that he believed that he was modifying the Contracts on behalf of Scott Tractor only, and not as the express agent of CNH Capital. Williams testifies that he "signed [the Contracts] on behalf of Scott Tractor and Case Credit," but also testifies that when he modified the Contracts he was "acting on behalf of Scott Tractor." Williams also testifies that it was "Scott Tractor [giving] [Defendants] the option of returning the equipment," and that "[i]f the [Defendants] returned the equipment, Scott Tractor paid the debt . . . with Case Credit."

Defendants have neither alleged, nor presented evidence, that Scott Tractor or Williams were apparent agents of CNH Capital when the Contracts were modified. To establish apparent

13

agency, Defendants must establish that they reasonably relied upon "the conduct of the principal;" however, Defendants have not directed the Court to any conduct of CNH Capital that they relied upon nor have they even claimed that they believed Scott Tractor or Williams was modifying the Contracts on behalf of CNH Capital.

The Court, therefore, finds that there is insufficient evidence to conclude that Scott Tractor or Williams was an express or apparent agent of CNH Capital when the Contracts were allegedly modified.

In sum, neither Williams nor Scott Tractor had express or apparent authority to modify the Contracts on behalf of CNH Capital, and there is no evidence that CNH Capital knew or should have known about the modification. Accordingly, Defendants may not assert this defense against CNH Capital.

### C.     Commercial Reasonableness of the Sale

Defendants argue that, even if they are liable to CNH Capital under the Contracts, they are not obligated to pay the entire deficiency in this case because the equipment was not sold in a commercially reasonable manner.

CNH Capital is a secured creditor, and its right to pursue a deficiency judgment is governed solely by Chapter 9 of Title 10 of Louisiana's Revised Statutes. La. Rev. Stat. Ann. § 13:4108.3. After default, a secured party may, with or without prior appraisal, sell, lease, or otherwise dispose of the collateral at any time and place and on any terms. See La. Rev. Stat. Ann. § 10:9-610(a)-(b). However, "every aspect of the disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." La. Rev. Stat. Ann. § 10:9-610(a)-(b). A disposition of collateral is reasonable if it is conducted "in the usual

14

manner on any recognized market." see La. Rev. Stat. Ann. § 10:9-627(b).

Defendants argue that the farm equipment was not disposed of in a commercially reasonable manner and support this argument, once again, with the affidavit of Williams. Williams testifies that on prior occasions Scott Tractor customers returned equipment after a year of use and that the equipment was then successfully resold without a deficiency. Thus, Williams is "of the opinion" that the equipment in this case was not sold in a commercially reasonable manner because different equipment, sold at a different time, and in a different method, obtained a greater price.

Williams's opinion, as a matter of law, cannot preclude CNH Capital from establishing that the sale of the collateral in this case was commercially reasonable. La. Rev. Stat. Ann. § 10:9-627(a) ("The fact that a greater amount could have been obtained by . . . disposition . . . at a different time or in a different method . . . is not of itself sufficient to preclude the secured party from establishing that the . . . disposition was . . . commercially reasonable . . . .").

CNH Capital has responded to Williams's claims with an uncontroverted affidavit from a representative of CNH Capital, Tonya Dilley ("Dilley"), establishing that the collateral was disposed of in a commercially reasonable manner in a recognized online market. According to Dilley's affidavit, after Defendants surrendered the equipment, CNH Capital notified Defendants that they intended to sell the equipment. CNH Capital then refurbished and prepared the equipment for resale and determined an asking price for the equipment by consulting equipment guide values, auction prices, and prevailing market conditions.

Next, CNH Capital offered the equipment for resale on the online bid list eqpower, an online auction well-known in the agricultural equipment market. See Eqpower,

15

http://www.eqpower.com/home.do (last visited May 23, 2008). Dilley attests that for the last eight years CNH Capital has used eqpower to sell equipment, and, although it has tried selling farm equipment by other methods, eqpower remains the most effective method. By using eqpower, CNH Capital was able to sell the eight pieces of farm equipment in this case at or about wholesale value. Specifically, two items were sold above wholesale value, three items were sold at 100% of wholesale value, and three items were sold at or above 93% of wholesale value. Defendants have not argued that any of CNH Capital's procedures were unreasonable.

The Court, therefore, finds that there is no genuine issue of material fact for a jury to conclude that CNH Capital's methods were anything but commercially reasonable. Accordingly, Arkla is obligated to pay the entire deficiency under the Arkla Contract and Wilmot is obligated to pay the entire deficiency under the Wilmot Contract and the Wilmot Contract II.

### D. Guarantors of the Contracts.

Finally, CNH Capital moves for summary judgment on whether Defendant Morris was a guarantor of the Contracts and whether Defendant Wilmot Flying was a guarantor of the Wilmot Contract II and Arkla Contracts.

Although Morris claims he does not remember signing guarantys associated with the Contracts, CNH Capital has presented an uncontroverted affidavit of an expert forensic document examiner, Robert G. Foley ("Foley"), who has determined that Morris signed separate guarantys for each contract. Second, Foley also concludes Morris, as an authorized representative of Wilmot Flying, guaranteed the Wilmot Contract II and Arkla Contract.[6]

---

[6] CNH Capital has not moved for summary judgment on whether Wilmot Flying is a guarantor of the Wilmot Contract.

16

Under these facts, there is no genuine issue of material fact as to whether Morris was a guarantor of the Contracts, and there is no genuine issue of material fact whether Wilmot Flying was a guarantor of the Wilmot Contract II and the Arkla Contract.

## III. Conclusion

For the foregoing reasons, CNH Capital's Motion for Summary Judgment is GRANTED.

Defendant Wilmot is liable to CNH Capital under the Wilmot Contract for the principal amount of $134,295.62, plus accrued but unpaid interest in the amount of $5,817.40 through August 31, 2007, plus interest as it continues to accrue on the unpaid principal amount ($134,295.62) at the rate of $24.65 per day from and after September 1, 2007, until paid. Wilmot is further liable to CNH Capital under the Wilmot Contract for attorney's fees and expenses, plus post-judgment interest thereon, and all costs.

Defendant Wilmot is liable to CNH Capital under the Wilmot Contract II for the principal amount of $129,002.63, plus accrued but unpaid interest in the amount of $6,006.20 through August 31, 2007, plus interest as it continues to accrue on the unpaid principal amount ($129,002.63) at the rate of $25.45 per day from and after September 1, 2007, until paid. Wilmot is further liable to CNH Capital under the Wilmot Contract II for attorney's fees and expenses, plus post-judgment interest thereon, and all costs.

Defendant Arkla is liable to CNH Capital under the Arkla Contract for the principal amount of $38,134.20, plus accrued but unpaid interest in the amount of $1,767.20 through August 31, 2007, plus interest as it continues to accrue on the unpaid principal amount ($38,134.20) at the rate of $7.52 per day from and after September 30, 2007, until paid. Arkla is further liable to CNH Capital under the Arkla Contract for attorney's fees and expenses, plus

post-judgment interest thereon, and all costs.

Morris is liable in solido as the guarantor of all amounts owed to CNH Capital under the Contracts.

Wilmot Flying is liable in solido as the guarantor of all amounts owed to CNH Capital under the Wilmot Contract II and the Arkla Contact.

MONROE, LOUISIANA, this \_\_\_11\_\_\_ day of \_\_\_June\_\_\_, 2008.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE